287 So.2d 569 (1973)
ORKIN EXTERMINATING CO., INC., Plaintiff and Appellant,
v.
James T. FOTI, Defendant and Appellee.
No. 4369.
Court of Appeal of Louisiana, Third Circuit.
November 30, 1973.
Rehearing Denied January 21, 1974.
Writ Granted April 5, 1974.
*570 Dubuisson & Dubuisson, by James T. Guglielmo, Opelousas, for plaintiff-appellant.
Taylor & Trosclair, by Earl B. Taylor, Opelousas, for defendant-appellee.
Before FRUGE, MILLER, and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This action for injunctive relief was instituted by Orkin Exterminating Co., Inc. against James Foti alleging breach of defendant's employment contract which contained provisions not to compete on the termination of his employment. After trial the district court granted a limited injunction in favor of plaintiff and against the defendant for two years from the date of defendant's termination of employment. The plaintiff appealed from this judgment. The defendant neither appealed nor answered plaintiff's appeal.
The plaintiff is substantially the largest exterminating corporation in the United States with operations and branch offices throughout the state of Louisiana. The defendant, James Foti, was first employed by Orkin in February 1968 as a salesman in Lafayette. Eighteen months later he was promoted to manager of the New Iberia office and thereby signed an employment contract which contained non-competition provisions. In June 1971 Foti was transferred to Monroe and was promoted to a branch manager position, again signing a similar employment contract. Thereafter, in order that he could be exposed to business management ideas and principles, Foti was transferred to the Louisiana District Office in Alexandria. Once again he signed another new employment contract on January 14, 1972. As this contract is *571 the particular one in question we quote its pertinent parts as follows:
"The Employee hereby expressly covenants and agrees, which covenants and agreements are of the essence of this contract, that he will not, during the term of this agreement and for a period of two (2) years immediately following the termination of this agreement, for any reason whatsoever, directly or indirectly, for himself or on behalf of, or in conjunction with, any other person, persons, company, partnership or corporation:
(a) call upon any customer or customers of the Company solicited or contacted by the Employee or whose account was serviced by the Employee, pursuant to his employment hereunder, for the purpose of soliciting or selling any pest control, exterminating, fumigating or termite control service for the eradication or control of rats, mice, roaches, bugs, vermin, termites, beetles or other insects within the territory stated in Paragraph 8(e);
(b) nor will he divert, solicit or take away any such customer or customers of the Company or the business or patronage of any such customers of the Company for the purpose of selling a service for eradication or control of rats, mice, roaches, bugs, vermin, termites, beetles or other insects within the territory stated in Paragraph 8(e);
(c) nor will he call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling any service for the eradication or control of rats, mice, roaches, bugs, vermin, termites, beetles or other insects within the territory stated in Paragraph 8(e);
(d) nor will he service any contracts or accounts for other employers, or for himself, anywhere within the territory stated in Paragraph 8(e);
(e) nor will he engage in the lawn and ornamental pest control service, pest control, exterminating, fumigating or termite control business as a manager/salesman/serviceman anywhere within the territory as specifically delineated and described as follows: The cities of Alexandria, Crowley, Monroe, Lafayette, Lake Charles, Natchitoches, New Iberia, Shreveport and Ruston all in the state of Louisiana and a radius of fifty miles of and from the official geographical boundaries of each city and town listed in this sub-paragraph 8e."
Thereafter Foti was transferred to Opelousas as a branch manager on April 1, 1972. No new contract of employment was signed after this transfer.
On September 30, 1972, Foti terminated his employment with Orkin, thereafter forming his own exterminating company, Yambilee Exterminating Co., Inc. on October 9, 1972. He began soliciting and doing business in the Opelousas and surrounding area including New Iberia, Bunkie, Marksville, Breaux Bridge, and St. Martinville. By his own testimony Foti admitted contacting and servicing former customers of Orkin.
On December 29, 1972, Orkin filed this suit praying for an injunction to restrict Foti from doing business in those respects which the above quoted contract provision provided.
The trial court granted a limited injunction, only recognizing sections (a) and (b) in the above cited contract.
Orkin appealed alleging that the entire "non-competition" clause should have been upheld.
We feel bound to follow our decision in National Motor Club of Louisiana, Inc. v. Conque, 173 So.2d 238 (La.App.3rd Cir. 1965), writs denied, 247 La. 875, 175 So.2d 110, and consider it to be controlling herein. Therefore we quote extensively *572 from the language used by Judge [now Justice] Tate therein.
"The basic provision of LSA-R.S. 23:921, incorporating the public policy of this state, flatly provides: `No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court * * *.' The 1962 amendment to be discussed below, permits a limited exception to this broad policy.
Even prior to the enactment by Act 33 of 1934 of this prohibition against exaction of noncompetitive agreements from employees, they were consistently held to be unenforceable. Cloverland Dairy Products v. Grace, 180 La. 694, 157 So. 393 (1943); Blanchard v. Haber, 166 La. 1014, 118 So. 117 (1928). See 27 Tul.L. Rev. 364 (1953). (In most states other than Louisiana, however, noncompetitive contracts are recognized if reasonably restricted as to time and area. See Annotations at 41 A.L.R.2d 15 and 43 A.L. R.2d 94.) In the absence of an enforceable contract to other effect, an employee has the absolute right to actively serve a business competing with his former employer after leaving the latter's service, Jones v. Ernst & Ernst, 172 La. 406, 134 So. 375 (1931); as, for instance, does a former officer who actively competes with his former corporate principal, Marine Forwarding & Shipping Co. v. Barone, La.App.Orl., 154 So. 2d 528 (1963).
As noted in these decisions, their essential basis is the right of individual freedom and of individuals to better themselves in our free-enterprise society, where liberty of the individual is guaranteed. A strong public policy reason likewise for holding unenforceable an agreement exacted by an employer of an employee not to compete after the latter leaves his employment, is the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away his liberty to earn his livelihood in the field of his experience except by continuing in the employment of his present employer.
These fundamental principles must be borne in mind in interpreting and applying to the present facts the 1962 amendment providing a limited exception to the above-quoted basic provision of LSA-R. S. 23:921, that noncompetitive agreements exacted of employees `shall be null and unenforceable in any court.'
The 1962 amendment did not repeal the broad statutory provision that noncompetitive agreements exacted from an employee were null and unenforceable. See Appendix A. The amendment simply added a proviso excepting those noncompetitive agreements of limited territory and duration `in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in.' In view of the retention of the broad provision for the unenforceability of such noncompetitive agreements and in the context of the prior jurisprudence, the apparent purpose of the 1962 amendment is to protect an employer only where he has invested substantial sums in special training of the employee or in advertising the employee's connection with his business.
We do not think noncompetitive agreements such as the present can be justified as valid on the naked ground that the employer spends sums advertising the business itself (as distinguished from advertising the employee's connection with it), for almost every business this day every department store, every service *573 station, even corner grocery stores spends money advertising its products and services. That is, for example, the Ford Motor Company could not validly require that its factory employees enter into noncompetitive agreements simply because Ford spends large sums advertising its product. To hold these general advertising expenses justified a noncompetitive agreement binding an employee, it seems to us, would make meaningless the broad and basic statutory prohibition against such agreements with only limited exceptions.
Likewise, we do not think that normal expenses of administration and supervision can be used to justify these noncompetitive agreements, on the guise that such are `training' expenses. If they are, then few if any employees could not be required to tie themselves down to their present employer by the exaction of noncompetitive agreements. What the legislators must have intended, it seems to us (since they did not repeal the basic prohibition against such contracts as void as against the public policy of this state), was to protect the investment of those employers who afford special training of a substantial nature to their employees, and to encourage them to do so.
We cannot hold that these normal costs of running a business are the sort of training and advertising expenses which validate noncompetitive agreements under the 1962 amendment, invalid otherwise under the basic provisions of LSA-R.S. 23:921 and under the public policy of Louisiana. If we do so, then in effect the basic provisions of the statute have been judicially repealed, for then all noncompetitive agreements exacted from employees may be held valid, whether or not the employer has incurred any special expenses in training the employee or advertising the employee's connection with the employer's businessthe special circumstances alone intended by the 1962 amendment as validating such noncompetitive agreements (and then only if entered into for a statutorily-limited duration and applying only to a statutorily-limited area . . .)"
In the present case Foti was employed almost five years with Orkin, during which plaintiff alleges that Orkin incurred so called "training" expenses at several points in time.
Plaintiff first of all points to a Manager Training School in Atlanta, Georgia, which defendant attended shortly after he became manager of the New Iberia office in 1970. However the only specific expenses for Foti which plaintiff establishes amount to $261.50 [$55.50 for meals, tips, taxi; $90.00 for lodging; $116.00 for plane fare.] As to other expenses allegedly incurred, Orkin's Technical Director only made general statements and estimates as to the cost of preparing for and operating the school.
In addition defendant attended one-day service training schools in Louisiana in 1970, 1971, and 1972. However, again Orkin's witness only made generalized statements and estimates as to the cost of preparing these schools. They failed to produce any records of any specific training expenses incurred here on behalf of Foti.
Orkin also contends that other "training" expenses were incurred when the defendant attended a Supervisor's Leadership Conference in August of 1972 in Baton Rouge. Again the plaintiff could produce no specific training expenses incurred.
Finally the plaintiff contends that Foti received special individualized training by the district manager, which amounted to several hours each month spent in conference.
In summary, Orkin has only established the insubstantial sum of $261.50 as expenses incurred directly on behalf of Foti. Elsewhere the generalized statements of their Technical Director are unimpressive,
*574 In addition we are of the opinion that the generalized alleged costs for the several one day service training schools and the Leadership Conference are not the type of expenses which Conque envisions. The plaintiff must have invested "substantial sums" in "special training of a substantial nature". In Conque the court termed the expenses incurred at company district manager meetings and manager sales clinics as "normal costs of administration" and not the "sort of employer investment for training which the legislature intended to permit protection of by nonthe record we come to the same conclusion competitive agreements". After reviewing as far as these indicated schools are concerned. The same is true for the conferences Foti had with his district manager.
We further note and approve of language used in Nalco Chemical Co. v. Hall, 237 F.Supp. 678 (E.D.La.1965), although this was before any definitive Louisiana cases had been decided on the 1962 Amendment to LSA-R.S. 23:921. Therein Judge West found the amendment obviously designed to apply only where money was expended for training an employee which was "not usually or customarily expended in the normal type of employment". He further stated that it "doesn't apply where only usual or customary training was given to acquaint the employee with his duties". Thus the amendment comes into play if the expenditures are such "whereby the employee is, by virtue of such expenditure by the employer, made a specialist in the employer's employ".
In our case we cannot say that Foti was made an expert in the field of extermination by attending one or even all of the schools alleged. In fact the agenda of these respective schools dealt almost entirely with administrative procedures, sales techniques, etc. Undoubtedly Foti could not have passed his required state examination to become an exterminator by the "knowledge" he gained from the alleged "specialized" training schools. Instead, the record indicates that the basic and necessary knowledge in the business of pest eradication and control was acquired by the defendant, Foti, by everyday exposure to the business during the five years he was employed by the plaintiff. We cannot envision a rule whereby a man who has learned a trade by his own ability and hard work "on the job" would be restricted by the courts from going out and trying to better himself by starting his own business. This would be contrary to our free-enterprise system.
Finally, even if we could consider these "schools" which Foti attended as "specialized training", for which Orkin alleges it expended "substantial" sums, we must note that after the contract in question was signed, January 14, 1972, Foti only attended the Supervisor's Leadership Conference and one of the service training schools, for which no specific training expenses on behalf of Foti were established. Orkin argues that this court must consider the entirety of Foti's employment, i.e. all of the contracts he signed, yet by the language in their contracts, once each new contract is signed the former is cancelled, with the exception of similar noncompetition provisions as cited above. Thus by their own contract Orkin has decreed that each former contract is nonexistent. This lends credence to defendant's argument that we cannot consider what took place before the January 14th contract in question. See Peltier v. Hebert, 245 So.2d 511 (La.App.3rd Cir. 1971); National Motor Club of Louisiana, Inc. v. Conque, supra.
In attempting to prove advertising expenses incurred by it, Orkin produced testimony showing advertising costs in excess of $100,000.00 for the entire state in 1970-71 and over $1,000.00 for the Opelousas area for a five month period in 1972. However, there is no evidence that these advertisements did other than advertise Orkin Exterminating Co., Inc. itself, as distinguished from advertising the defendant *575 Foti's connection with the business. Conque clearly holds that these "normal advertising expenses" are insufficient to bring the defendant under the 1962 amendment.
We again recognize that this result is in possible conflict with other Louisiana Courts of Appeal in their holding that "general administration and advertising expenses suffice". National School Studios, Inc. v. Barrios, 236 So.2d 309 (La.App.4th Cir. 1970); World Wide Health Studios, Inc. v. Desmond, 222 So.2d 517 (La.App. 2nd Cir. 1969); Aetna Finance Co. v. Adams, 170 So.2d 740 (La.App.1st Cir. 1964), but we adhere to the contrary reasoning in Conque.
Although by our Conque holding the limited injunction herein should probably have been denied, as well as rendering the noncompetitive agreement unenforceable, the defendant did not appeal or answer the appeal; therefore we may not disturb the trial court judgment in that regard. The fact is, as indicated by defendant's counsel in brief and at oral argument, that defendant was perfectly content in abiding by the trial judge's decision and chose not to appeal.
For the above and foregoing reasons the judgment of the trial court is affirmed. Costs of this appeal are to be paid by Orkin Exterminating Company, Inc.
Affirmed.
MILLER, J., dissents and assigns written reasons.
MILLER, Judge (dissenting).
I respectfully dissent from the foregoing interpretation of LSA-R.S. 23:921.[1] There has been no attempt to explain or reconcile the varied interpretations of this statute among the different court of appeal circuits of this state. Instead manifest error was found in the trial court's factual determination. The majority has relied solely upon the holding in National Motor Club of Louisiana, Inc. v. Conque, 173 So. 2d 238 (La.App. 3 Cir. 1965). Even under the criteria set forth in Conque, Orkin is entitled to relief.
Orkin has incurred substantial expenses in training Foti. Under the provision of the cited statute Orkin is entitled to enforce the contractual provisions whereby Foti agreed not to compete in certain territories for a period of two years.
There is no manifest error in the trial court's finding that Foti was bound by his contract, but the trial court erred as a matter of law in enforcing only selected contractual provisions and failing to enforce all contractual terms.
Foti was employed by Orkin in February of 1968 knowing nothing about the pest control business. Because of his experience and Orkin's training, Foti passed a difficult state licensing test in April, 1972. In four and a half years, Foti rose from *576 the lowest of Orkin's employees to become one of Orkin's top employees in the state of Louisiana. Within five months after Foti passed the licensing test, he left Orkin to establish his own pest control business and competed with Orkin in territories where he had represented Orkin and where he specifically agreed not to compete.
Substantial sums were spent by Orkin to train Foti so that he could pass the licensing test and to give him the needed skills to establish his own pest control business. As Orkin's branch manager Foti had access to fifteen to twenty service manuals and technical bulletins which were annually updated. Several of these bulletins and manuals were introduced in evidence. The table of contents of one manual demonstrates the specialized training provided by Orkin at substantial expense.

 CONFIDENTIAL
 ORKIN EXTERMINATING COMPANY, INC.
 ORKIN SERVICE STANDARDS
 TABLE OF CONTENTS
 Page
 I Homes and Apartments 1- 4
 II Hotels, MotelsHospitals, Office Buildings 5-10
 III Food Serving Establishments 11-18
 IV Food Markets & Grocery Stores 19-22
 V Department and Dry Good Stores 23-29
 VI Dry Cleaners, Laundries, & Laundromats 30-31
 VII Flower Shops 32-33
 VIII Pet Shops & Kennels 34-35
 IX Radio & T. V. Stations 36-37
 X Non-Food Warehouses 38-41
 XI Food & Feed Warehouses 42-44
 XII Farms 45-46
 XIII Food Processing Plants 47-50
 XIV Canning Plants 51-
 XV Creameries & Dairies 52-53
 XVI Frozen Food Processing Plants 54-
 XVII Breweries, Distilleries, Bottling Plants 55-58
XVIII Potato Chip Plants & Bakeries,
 Meat & Poultry Packing Plants 59-62
 XIX Grain Elevators & Flat Grain
 Storage Facilities 63-64
 XX Peanut & Pecan Shelling Plants 65-69
 XXI Rice Mills 70-73
 XXII Vegetable Oil Mills 74-77
XXIII Public ConveyancesAirplanes, Trucks
 Trailers, Boxcars, etc. -78

Each section details methods to be used for extermination of particular pests in particular areas, as well as the manner of application. This comprehensive and expensive training goes beyond the normal scope of training experience one might expect from on-the-job training and personal observation.
The expenses incurred by Orkin for Foti's training at the 7½ day Managers Training School at Atlanta were, I submit, improperly minimized by the majority. Ignored is the fact that Orkin itself operates this school. Orkin had to provide the instructors, knowledge, research, and the location for the school. Likewise the one-day service training schools were improperly minimized. Furthermore the majority has applied a strained and artificial construction to Foti's numerous contracts to hold that only expenses incurred after the January 14, 1972 contract are relevant to meet the LSA-R.S. 23:921 standard. The same non-competition covenant was in force and effect throughout Foti's employment. Foti agreed not to compete in every contract. The new contracts added new territories in which Foti agreed not to compete.
The facts of this case present a classic case for enforcement of LSA-R.S. 23:921. I respectfully dissent.
NOTES
[1] § 921. Competing business; contracts against engaging in forbidden; exceptions

No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that even it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years. As amended Acts 1962, No. 104, §§ 1, 2.